**FEDERAL DEPOSIT INSURANCE COR- PORATION, as Receiver of Twin City Savings, FSA, Plaintiff–Appellee,**

v.

**Robert L. McCULLOUGH and Mary Nan McCullough, Defendants–Appellants.**

No. 89–7195.

United States Court of Appeals, Eleventh Circuit.

Sept. 10, 1990.

W. Eugene Rutledge, J. Michael Cooper, W. Eugene Rutledge & Associates, P.C., Birmingham, Ala., for defendants-appellants.

J. Marshall Gardner, Vickers, Riis, Murray & Curran, Mobile, Ala., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, JOHNSON and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

In *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the United States Supreme Court held that as a matter of federal common law the Federal Deposit Insurance Corporation ("FDIC") could rely upon a defense of estoppel to prohibit parties from relying upon alleged arrangements not clearly appearing in the bank's records.[1] The Court reasoned that the Congressional purpose for creating the FDIC was to protect the fiscal stability of financial institutions, thereby ensuring the availability of funds deposited within those institutions. Because unrecorded special arrangements result in the FDIC being unaware of the true level of a given bank's assets and commitments, such arrangements prevent the FDIC from rigorously overseeing the bank's operations. Therefore, to protect "[the FDIC] and the public funds which it administers against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures or to which it makes loans," 315 U.S. at 457, 62 S.Ct. at 679, the Court concluded that a defense to a suit on a note could not be premised upon "a scheme or arrangement whereby the banking authority ... was likely to be misled." *See id.* at 460, 62 S.Ct. at 681; *see also Langley v. FDIC*, 484 U.S. 86, 92, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1988).

In the past decade an ever-increasing number of financial institutions have encountered significant difficulty maintaining solvency. As more and more of these institutions became insolvent, two federal agencies, the FDIC and its counterpart in the savings and loan industry, the Federal Savings and Loan Insurance Corporation ("FSLIC"), have been required to assume the responsibility for the assets and liabilities of these institutions. With the increased involvement of these two agencies in untangling the web created by failed institutions and by financial arrangements gone awry has come a concomitant need to determine the applicability and breadth of the defenses precluded by the Supreme Court's *D'Oench* decision.

In this case, we are called upon once again to make that determination. Concluding that the body of case law developed by *D'Oench* and its progeny effectively bars the defenses sought by appellant in this case, we affirm the judgment of the district court.

## I. BACKGROUND

In August 1985, appellant Robert McCullough orally agreed to acquire several

---

1. In *D'Oench*, the FDIC had brought suit in its corporate capacity to collect on an overdue note that it had acquired. Defending against the FDIC's suit, the party having executed the note averred that it had arranged a special, side agreement with the bank which had originally been a party to the note that the note would never be called for payment.

pieces of property owned by Charles Little and financed through Twin City FSB ("Old Twin City"). As part of this agreement, it was understood that McCullough would assume Little's debt of $1,030,000.00 being held by Old Twin City, and that in consideration, several pieces of Alabama real estate then owned by Little and mortgaged to Old Twin City would be transferred to McCullough. As an additional portion of this transaction, Little and Billy Lewis, Old Twin City's chief executive officer, orally promised to transfer other property— namely, (1) 486 acres of real estate in Covington County, Alabama, that were mortgaged to Old Twin City, and (2) various oil leases that were pledged to Old Twin City—to McCullough as part of their agreed-upon deal. It is this latter oral promise, which has gone unfulfilled, which is the focal point of this litigation.

Both Little and Lewis were anxious to consummate the oral arrangement as quickly as possible. Lewis knew that federal bank examiners would soon be arriving at Old Twin City. Given the serious financial difficulties that Little had been experiencing, Lewis knew that Old Twin City's loans to Little would be viewed as presenting an unacceptable credit risk. Thus, it was imperative to Lewis that the transfer of Little's indebtedness be conducted expeditiously. The parties agreed that once the necessary paperwork was executed to reflect McCullough's assumption of the loan, they would conduct a formal closing at a later date to remedy any deficiencies in the paperwork.

Once the transaction had been formally approved by Old Twin City, the parties hurried to execute the necessary papers to evidence McCullough and his wife's assumption of Little's indebtedness. Although these papers reflected that portion of the August agreement concerning the Old Twin City note, the mortgages held by Old Twin City on various pieces of property, and various rent assignments, the papers made no mention of the earlier oral agreement that the McCulloughs were to receive title to the 486 acres of property in Covington County or that the oil leases

pledged to Old Twin City were to be transferred to the McCulloughs.

After execution of the papers, confusion reigned. Despite repeated requests to obtain formal notification from Old Twin City that title to the various properties had been transferred to him and that the proper documentation was complete, McCullough never received proper documentation. Additionally, although Little continued to receive rental payments from the properties transferred to McCullough, the checks issued by Little reflecting receipt of the rental payments were rejected for insufficient funds.

To rectify these problems, McCullough again met with Little and Lewis at the Old Twin City offices on May 21, 1986. As McCullough recounts in his affidavit, he commenced the meeting by informing Lewis and Little of the problems he had been experiencing:

> I told Mr. Lewis that I was completely disgusted with the entire transaction. I told him that I had been promised that the transaction would be properly closed as soon as possible after the examiners had left Twin City Savings Bank, that the rents on the properties would be coming to me and that they would be adequate to cover the lease payments. Instead, several months had passed and I had no evidence that the property had ever been promised to me, there had never been a proper loan closing, I had seen no title insurance, the oil leases had not been assigned to me and I had up to that time received no rent.

McCullough assured Lewis that he intended to fulfill his obligations as soon as he received all of the proper paperwork from Little and the terms of the assumed note were renegotiated to reflect more favorable terms. Little's attorney explained to McCullough that the reason that McCullough had not received the closing papers (e.g., the deeds and title policies) was because Old Twin City had not yet signed documents releasing Little from the indebtedness.

When Lewis agreed to issue the releases to Little, Little's attorney provided what

were represented to be the proper documents transferring title to McCullough. McCullough accepted the documents without reviewing them. These papers made no mention of the Covington County acreage or the oil leases. Erroneously thinking that he had worked out his difficulties, McCullough returned home and issued a check to Old Twin City bringing the loan current. His problems with Old Twin City, however, continued unabated. Some time later, McCullough realized that he still had not received title to the 486 acres in Covington County and the oil leases that had been promised. Additionally, despite assurances to the contrary from Old Twin City, McCullough's requests for an amended note and mortgage as had been agreed upon during the May 21, 1986, conference went unanswered. Moreover, in October 1986, McCullough was informed that Little had declared bankruptcy and that, contrary to his earlier understandings, Little's interest in the 486 acres and oil leases had never been transferred.

On January 31, 1987, McCullough made his final payment to Old Twin City. With that payment, he informed the bank that he would make no further payments until he received an amended mortgage and note, the title to the 486 acres in Covington County and the promised assignment of the oil leases. Although Old Twin City did provide McCullough with an amended note, his other requests went unanswered.

On August 20, 1987, Old Twin City was declared insolvent and was placed in receivership by the Federal Home Loan Bank Board ("FHLBB"). The FHLBB appointed the FSLIC as receiver for the bank and directed the FSLIC to organize Twin City Savings, FSA ("New Twin City"). The FSLIC was further instructed to conduct a purchase and assumption transaction whereby New Twin City purchased substantially all of the assets and assumed substantially all of the liabilities of Old Twin City, including the note, mortgage and assignment of rents executed by McCullough.

Finding the McCullough note to be significantly in arrears, New Twin City instituted this litigation to recover on the note.

## II. PROCEEDINGS BELOW

In the district court, the McCulloughs [2] defended against New Twin City's suit by raising a multitude of defenses. They argued that the note and mortgage should be considered void because Little and Old Twin City had fraudulently induced them to assume Little's prior indebtedness. They contended that had they known that Little and Old Twin City would not convey to them the Covington County property and the oil leases, they would never have agreed to the transaction. Relying upon similar grounds, they argued that the transaction should be declared void due to a failure of consideration. In addition, the McCulloughs claimed that the mortgage being sued upon was legally insufficient because the notarization was not conducted in accordance with Alabama law.[3]

On cross motions for summary judgment, the district court granted judgment to New Twin City. The district court held that the *D'Oench* doctrine applied to the FSLIC and to successors of the FSLIC who obtain the assets of a failed bank, and that the *D'Oench* doctrine precluded the McCulloughs' defense premised upon unconsummated, oral side agreements. Additionally, the district court, following a recent Fifth Circuit case, *FSLIC v. Murray*, 853 F.2d 1251 (5th Cir.1988), held that when the FSLIC became the receiver of the failed bank, it achieved holder in due course status with regard to the note in question as a

---

**2.** Although only Robert McCullough was actively involved in the negotiations with Little and Old Twin City, both he and his wife were signatories to the note and mortgage.

**3.** The McCulloughs raised several other defenses not relevant here including a contention that the sued-upon promissory note, mortgage, and assignment were void because at the time they were transferred to McCullough, Old Twin City was not qualified to do business in Alabama under Alabama law, 1975 Ala.Code § 10–2A–247. This defense was wholly without merit. 1975 Ala.Code § 5–16–39; *see also Midwest Homes Acceptance Corp. v. Langdon*, 253 So.2d 29, 30–31 (Ala.1971).

matter of federal common law. When the note was then assigned to New Twin City by the FSLIC, the district court reasoned, New Twin City similarly was protected from the alleged promises by being a holder in due course.

The district court also rejected the McCulloughs' argument that the mortgage in this case should be declared void because it was acknowledged by a notary public who was not present at the signing of the mortgage. Instead, the district court ruled that, under Alabama law, the bank had an equitable mortgage in the property.

## III. CONTENTIONS

On appeal, the McCulloughs argue that the district court made a fundamental error in rejecting their defenses to the note. They contend that, under the circumstances of this case, the principles underlying the *D'Oench* doctrine are inapplicable to their defenses of failure to perform a condition precedent, failure of consideration, and fraudulent inducement. The federal common law protections emanating from *D'Oench* and its progeny, they assert, do not properly extend to either (1) the FSLIC as a receiver for a failed savings and loan or (2) successors of the FSLIC who obtain the assets of the failed savings and loan.

The McCulloughs further contend that, under the facts of this case, New Twin City was not entitled to an equitable mortgage. They note that it is uncontested that the mortgage in this case was not properly witnessed or acknowledged under Alabama law. Arguing that they provided sufficient facts to establish that Old Twin City engaged in fraud, they claim that New Twin City, as the successor to Old Twin City's rights, cannot call upon equity to protect its interest.

## IV. RELEVANT SUBSEQUENT EVENTS

Since the district court's ruling on New Twin City's motion for summary judgment, several significant occurrences have transpired which simplify our discussion of many of the issues in this case. As a result, prior to embarking into an analysis of the various arguments raised by the appellants, some discussion of these occurrences and their relevance to this litigation is in order.

### A. *Identifying the Real Party in Interest*

Subsequent to the date that the district court issued its opinion, motions have been filed by various federal entities seeking to substitute themselves for New Twin City Bank. Accordingly, we deem it advisable as a preliminary matter to determine exactly who, at this point, is the real plaintiff party in interest and appellee in this litigation.

New Twin City Bank commenced this litigation against the appellants and was the plaintiff party on November 9, 1988, when the district court issued its ruling on the outstanding motions for summary judgment. The appellants, rather than immediately appealing the district court's ruling, timely filed a motion for reconsideration with the district court. This motion was denied on March 3, 1989.

On November 9, 1988, the same date that the district court issued its ruling in favor of New Twin City Bank, the FHLBB determined that New Twin City, following in the footsteps of its predecessor, Old Twin City, was insolvent. The FSLIC again was appointed receiver. On December 9, 1988, with the appellants' motion for reconsideration still pending in the district court, the FSLIC filed a motion to substitute itself as party plaintiff in lieu of New Twin City. This motion was granted on December 14, 1988, two and one-half months prior to the denial of appellants' motion for reconsideration.

■ Thus, notwithstanding the fact that the FSLIC had not yet entered the litigation at the time the district court issued its ruling on New Twin City's motion for summary judgment, the FSLIC as receiver for New Twin City was the actual plaintiff party at the time the district court issued its *final* order in this case denying the outstanding motion for reconsideration. *See Griggs v. Provident Consumer Dis-*

*count Co.*, 459 U.S. 56, 103 S.Ct. 400, 403, 74 L.Ed.2d 225 (1982) (district court's order is not a final, appealable order when timely filed motion to reconsider pursuant to Fed. R.Civ.P. 59(e) remains pending); *cf. In re Savers Federal Savings & Loan Association*, 872 F.2d 963, 964 (11th Cir.1989) (upon being appointed conservator of failed bank, the FSLIC automatically becomes party to lawsuit involving that bank).

Indeed, a parallel can be drawn between the proceedings in this case, and those found in *FSLIC v. Two Rivers Associates*, 880 F.2d 1267 (11th Cir.1989). In *Two Rivers Associates*, the defaulted notes and mortgages in question had been issued by the Sunrise and Loan Association of Florida ("Old Sunrise"). The FHLBB declared Old Sunrise insolvent and appointed the FSLIC as receiver. The FSLIC reorganized Old Sunrise into the Sunrise Savings and Loan Association ("New Sunrise") and transferred all of Old Sunrise's assets and liabilities to New Sunrise.

New Sunrise brought suit in state court to enforce the promissory notes and foreclose the mortgages. The state court issued a partial summary judgment finding the notes and mortgages valid and in default, and directed a public sale of the properties if the debt was not satisfied within three days. Simultaneously, the state court granted a motion allowing the debtors to file amended answers.

The debtors filed amended answers, and also moved for reconsideration of the grant of summary judgment. While the motion for reconsideration was pending, the FHLBB determined that New Sunrise was

insolvent and appointed the FSLIC as receiver for the purpose of liquidating New Sunrise's assets and making payments of its liabilities.

Before the state court ruled on the motion to reconsider, the FSLIC was substituted for New Sunrise in the case and the case was removed to federal court. When reanalyzing the issues on summary judgment, both the district court and a panel of this court reviewed the case from the perspective of the FSLIC, and not New Sunrise, being the proper party in interest.

Hence, we need not on this appeal determine whether the district court was correct in following those courts that have held that successors to the FSLIC or the FDIC are entitled to the same common law defenses as may be asserted by the FSLIC or the FDIC. *See, e.g., Porras v. Petroplex Savings Ass'n*, 903 F.2d 379, 381 (5th Cir. 1990) (holding that "[c]laims and defenses barred as to the FSLIC by the *D'Oench, Duhme* doctrine are similarly barred as to private parties who purchase the assets of the failed institution from the FSLIC"); *FDIC v. Newhart*, 892 F.2d 47 (8th Cir. 1989) (according the FDIC's federal holder in due course status to a private party purchasing notes from the FDIC). Rather, our focus is merely limited to those defenses that could be asserted by the FSLIC, as real party in interest. Moreover, because there had not yet been a final judgment in this case at the time the FSLIC became a party, the FSLIC is entitled on this appeal to raise any federal common law defenses it may possess.[4] *Compare Olney Savings*

4. Since this appeal was docketed, the FSLIC has been abolished by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, § 401(a); 103 Stat. 183, 354 (1989) and the FDIC has been substituted in place of FSLIC. For all practical purposes, this substitution has no bearing upon our analysis of the issues presented. Although the FSLIC as receiver was never entitled to rely upon the statutory defenses that the FDIC is entitled to raise, *see* 12 U.S.C. § 1823(e), *as amended by* FIRREA, Pub.L. No. 101–73, § 217(4), 103 Stat. at 256, FSLIC was entitled to assert its federal common-law defenses emanating from *D'Oench* and its progeny. *See Two Rivers Associates*, 880 F.2d at 1274–77. Both § 1823(e) and the *D'Oench* common law doc-

trine are designed to further the same objective of protecting the federal banking regulatory authority from undocumented agreements that impede the regulatory authority's ability to perform its Congressionally mandated functions. Because § 1823(e) is merely a codification of *D'Oench* and its progeny, defenses premised upon § 1823(e) and *D'Oench* are usually construed in tandem. *Olney v. Savings & Loan Ass'n v. Trinity Banc Savings Ass'n*, 885 F.2d 266, 274 (5th Cir.1989); *Beighley v. FDIC*, 868 F.2d 776, 784 (5th Cir.1989). *See Langley v. FDIC*, 484 U.S. 86, 90–93, 108 S.Ct. 396, 401–02, 98 L.Ed.2d 340 (1988). The FIRREA amendments allow the FDIC as receiver to rely upon § 1823(e); thus, it matters not whether we refer

& Loan Ass'n v. Trinity Banc Savings Ass'n, 885 F.2d 266, 275 (5th Cir.1989) (holding that the FSLIC does not possess "a right, title, or interest" in a challenged instrument and thus cannot assert federal common law defenses when, at the time the FSLIC enters the litigation, there already is a final judgment holding the challenged instrument to be void); Grubb v. FDIC, 868 F.2d 1151, 1159 (10th Cir.1989) (same holding with respect to the FDIC).

### B. D'Oench Doctrine Protections Extend to the FSLIC as Receiver

█ Given that we have identified the FSLIC as the real party in interest at the time of the district court's final judgment, the next question to be addressed is whether the FSLIC as receiver for a failed savings and loan institution is entitled to rely upon the D'Oench doctrine and raise federal common law defenses to defeat state law claims of fraudulent inducement and failure of consideration when suing upon a note in default. Although not published until after briefs were filed with this court, a panel of this court has recently resolved this issue in the affirmative, holding that the FSLIC in its capacity as receiver is entitled to raise federal common law defenses premised upon the D'Oench doctrine. Two Rivers Associates, 880 F.2d at 1274–77.

In reaching this conclusion, the Two Rivers Associates court first observed that the policy reasons underlying the Supreme Court's decision in D'Oench leading to the development of a federal common law estoppel defense for the FDIC were equally applicable to the FSLIC: "since the FSLIC has parallel duties and power with respect to savings and loans as the FDIC has with banks, the federal policy should protect the FSLIC to the same extent it protects the FDIC." Two Rivers Associates, 880 F.2d at 1274–75 (footnote omitted). Next, the Two Rivers Associates court rejected the suggestion appearing in our prior cases that the D'Oench doctrine should be available to the FSLIC or the FDIC only when it

to the appellee as the FSLIC or the FDIC.

litigates in its capacity as corporate insurer and not in its receivership capacity. See Trigo v. FDIC, 847 F.2d 1499, 1502 n. 4 (11th Cir.1988); Gunter v. Hutcheson, 674 F.2d 862 (11th Cir.), cert. denied, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). Drawing upon recent Supreme Court authority, see Langley v. FDIC, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), the Two Rivers Associates court discerned no basis for distinguishing between whether suit was being brought in the FSLIC's corporate or receivership capacity. In either instance, the Two Rivers Associates court noted that the federal policy underlying the D'Oench doctrine supported its application. The court observed that the D'Oench doctrine embodies the recognition that an unrecorded agreement hinders the ability of the federal regulatory authorities to make swift and reliable evaluations of the assets of a given financial institution and that the ability to make such assessments was imperative both when the FDIC or the FSLIC was insuring a bank and when the FDIC or the FSLIC was taking over a failed bank. In short, "the federal policy protects the FDIC or the FSLIC's reliance on the bank records even before the institution fails.... [O]ne of the harms which this rule protects against occurs no later than the time at which [the FSLIC] conducts its first bank examination that is unable to detect the unrecorded agreement." 880 F.2d at 1277 (citations, quotations, and footnote omitted).

### V. APPLICATION OF THE D'OENCH DOCTRINE BARS THE MCCULLOUGHS' DEFENSES TO THE NOTE

Having determined that the FSLIC was the real party in interest at the time of the district court's final judgment and that the FSLIC even in its receivership capacity is entitled to raise federal common law defenses derived from D'Oench, we now turn to the precise scope of those defenses.

Although the precise claim that was defeated in D'Oench addressed a private party's claim premised upon a secret agree-

Therefore, for convenience sake only, we refer to the FSLIC as the appellee in this matter.

ment that a note need not be repaid, the policy considerations leading to the development of federal common law in *D'Oench* have resulted in extension of the *D'Oench* estoppel doctrine well beyond that precise factual setting. Borrower defenses premised upon other purported, unwritten statements leading to claims of fraudulent inducement or failure of consideration are now also generally precluded by *D'Oench* and its progeny. *See, e.g., FSLIC v. Murray,* 853 F.2d 1251, 1255 (5th Cir.1988) (failure of consideration); *FDIC v. McClanahan,* 795 F.2d 512, 516 (5th Cir.1986) (same); *Gunter,* 674 F.2d at 874 (fraud). Such defenses if allowed against the FSLIC or the FDIC would, like the defense at issue in *D'Oench,* contravene the primary federal policy that the FSLIC and the FDIC must be able to rely upon financial institutions' records in order to best protect the public funds they administer. *See Two Rivers Associates,* 880 F.2d at 1274–75. The evil to be prevented in any of these situations is precisely the same: the private party seeks to rely upon unrecorded promises or schemes that purport to impose obligations other than those appearing in the bank's records upon the financial institution.

■ Whether a borrower's defense is barred by the *D'Oench* doctrine depends upon whether the purported agreement relied upon by the private party was ever memorialized in writing or otherwise made explicit such that the FSLIC or the FDIC would have knowledge of the bank's obligations during an evaluation of the bank's records.[5] *See Two Rivers Associates,* 880 F.2d at 1275. If the bank's records reveal that the bank has agreed to certain additional obligations, then the *D'Oench* estoppel doctrine would not preclude a borrower's claim that the bank had not satisfied those additional obligations. *Id.* (citing

*Howell v. Continental Credit Corp.,* 655 F.2d 743, 746 (7th Cir.1981)). In such an instance, the bank's responsibilities are clearly delineated by documents in that bank's files manifesting the bank's reciprocal obligations.

On the other hand, if side agreements or other inducements cannot be determined by a review of the bank's files, then it cannot be said, without additional proof, that the FSLIC or the FDIC was aware of the additional commitments allegedly made by the bank. Given federal policy favoring reasonable reliance upon existing bank records evidencing all of the bank's existing commitments, *see Two River Associates,* 880 F.2d at 1275, such unrecorded commitments will not be honored.

■ While on its face, such a policy may appear inequitable to those parties relying upon a bank's unrecorded promises or arrangements, it must be recalled that a party who accedes to a bank's oral inducements, without memorializing the same is, to at least some extent, responsible. Because such a party "lent himself to a scheme or arrangement whereby the banking authority ... was likely to be misled," that party cannot rely upon that same scheme or arrangement to defend against the banking authority's subsequent actions. *See Langley v. FDIC,* 484 U.S. at 92, 108 S.Ct. at 402. The *D'Oench* doctrine "favors the interests of depositors and creditors of a failed bank, who cannot protect themselves from secret agreements, over the interests of borrowers, who can." *Bell & Murphy & Assoc. v. Interfirst Bank Gateway,* 894 F.2d 750, 754 (5th Cir.1990), *pet'n for cert. filed,* (No. 89–1893). Thus, neither a claim of lack of intent to deceive banking authorities nor a claim that the purported secret arrangement was not by its nature fraudulent is sufficient to defeat application of the *D'Oench* doctrine.[6]

---

5. Under this inquiry, it is irrelevant whether the FSLIC or FDIC has knowledge of the unrecorded agreement or scheme at the time it *acquires* the note. *Two Rivers Associates,* 880 F.2d at 1275 n. 12; *see Langley,* 484 U.S. at 93–95, 108 S.Ct. at 402–03; *FDIC v. Merchants National Bank of Mobile,* 725 F.2d 634, 640 (11th Cir. 1984).

6. There may be instances in which the borrowers are wholly innocent of any misconduct and, additionally, cannot be said to have lent themselves to arrangements that might deceive the banking authorities. *See, e.g., FDIC v. Meo,* 505 F.2d 790, 793 (9th Cir.1974); *cf. Langley,* 484 U.S. at 93–95, 108 S.Ct. at 402–03 (observing that a borrower's claim of fraud in the factum

*Campbell Leasing, Inc. v. FDIC*, 901 F.2d 1244, 1248 (5th Cir.1990); *Beighley v. FDIC*, 868 F.2d 776, 784 (5th Cir.1989); *see also Chatham Ventures, Inc. v. FDIC*, 651 F.2d 355, 361–62 (5th Cir. Unit B 1981).

 Looking to the facts of this case, it is readily apparent that the FSLIC was entitled to avail itself of the *D'Oench* doctrine. To put the FSLIC on notice that a bank had promised to convey additional property in consideration for the execution of the note, mortgage and rent assignments, the borrower must be able to point to documents that "clearly manifest[ed] the bilateral nature of the [parties'] rights and obligations." *Two Rivers Associates*, 880 F.2d at 1275, quoting *Howell v. Continental Credit Corp.*, 655 F.2d at 747. Within Old Twin City's files, however, was nothing that would indicate the bank's firm obligation to transfer the Covington County property and the oil leases to the McCulloughs.

The McCulloughs argue that two documents in the bank files manifest the obligation to transfer the additional property. The first document, a memorandum given to McCullough in August 1985, was written prior to the execution of the relevant note, mortgage and rent assignment, and merely alludes to "new appraisals" and a "transfer of oil runs." Subsequently, when the note, mortgage and rent assignments at issue in this case were executed, it is undisputed that these documents contained no reference to either the Covington County property or to the oil leases. Thus, even if we were to assume that the vague allusions in the August memorandum could be construed as evidence that at one point in time there was discussion of possibly transferring some undefined "oil runs," we nonetheless conclude that there is no *explicit documentation* evidencing Old Twin City's *obligation* to transfer specific properties to the McCulloughs. *See Two Rivers Associates*, 880 F.2d at 1275. Similarly, the second document, a letter written in September 1986, mentions only an "amendment to

the mortgage." It too is insufficient as a matter of law to give notice to the FSLIC that Old Twin City had made a fixed commitment to act in a manner other than that set forth in the executed documents. *Id.*

Finally, it must be noted that McCullough is at least partially responsible for the predicament in which he finds himself. McCullough was active throughout the actual negotiations leading up to the consummation of the deal at issue and could easily have insisted that inclusion of the Covington County property and the oil leases be made explicit in the papers. *See Two Rivers Associates*, 880 F.2d at 1274. Moreover, McCullough freely concedes that he executed the mortgage and note without insisting upon the formalities of a loan closing "as an accommodation to Twin City Savings Bank and Mr. Little" and that he knew that speed was essential to the bank due to an impending visit from bank examiners. Additionally, McCullough admits that he had the opportunity to examine the documents at closing and did not avail himself of this opportunity. All told, it is apparent that McCullough voluntarily associated himself with an arrangement that had the potential to mislead the FSLIC as to Old Twin City's obligations. *See Langley v. FDIC*, 484 U.S. at 93, 108 S.Ct. at 402 ("one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme or arrangement that is likely to mislead the banking authorities, whether the condition consists of a counterpromise (as in *D'Oench, Duhme*) or of the truthfulness of a warranted fact"); *FDIC v. McClanahan*, 795 F.2d at 516 (borrower who acts recklessly cannot rely upon defenses of failure of consideration or fraud in the inducement in an attempt to overcome application of the *D'Oench* doctrine).

Accordingly, we conclude that the McCulloughs' defenses of failure to perform a condition precedent, failure of consideration, and fraudulent inducement all are

would not be barred by *D'Oench*). Because as we discuss in the text, *infra*, pages 601–02, McCullough clearly does not fall within this

category, we need not address the parameters of this exception here.

barred by the FSLIC's invocation of the *D'Oench* doctrine.

## VI. APPLICATION OF *D'OENCH* DOCTRINE BARS MCCULLOUGH'S DEFENSE TO THE MORTGAGE

■ The McCulloughs' last defense concerns a legal insufficiency in the mortgage that was executed to secure the now defaulted note. Although facially appearing to be a valid, legal mortgage, the parties agree that the mortgage was not witnessed or acknowledged in proper fashion. At the time that the mortgage was signed, the notary whose signature appears on the mortgage was, in fact, not present. Under Alabama law, the McCulloughs argue, this flaw renders the mortgage insufficient to pass legal title to the real estate described in the mortgage. *See Central Bank of the South v. Dinsmore*, 475 So.2d 842 (Ala. 1985).

Although the error in acknowledgement might render the mortgage voidable were this suit involving two private parties litigating under state law, we conclude that the FSLIC's federal common law defenses bar the McCulloughs' claim of improper notarization. On its face, the mortgage appears valid. As such, it would have been impossible for the bank examiners to have had any suspicions concerning the legal sufficiency of the mortgage during an examination of Old Twin City's records. Additionally, the flaw in the mortgage is one that the McCulloughs could have easily guarded against by merely waiting to sign the mortgage until a notary's presence was secured. Because the McCulloughs were aware that the document they signed was a mortgage, we are constrained to conclude that the McCulloughs lent themselves to a scheme or arrangement (i.e., that the mortgage would be signed without the presence of a notary and that a notary would later affix her signature) that was likely to mislead the banking authorities (by leading them to believe that the mortgage was legally valid).[7] Accordingly, the McCulloughs' claim is barred by the *D'Oench* doctrine.

In concluding that application of the *D'Oench* doctrine in this case is appropriate, we observe that application of federal common law cannot be viewed as being inconsistent with the settled expectations of individuals engaging in transactions under state law. *See Gunter*, 674 F.2d at 872. Under Alabama law, the failure to acknowledge a mortgage properly does not render the mortgage void or even voidable in all cases.[8] *See, e.g., Central Bank of the South*, 475 So.2d at 846–47. For example, under Alabama law, when a bona fide purchaser for value takes a mortgage without notice of errors in the mortgage's acknowledgement not readily appearing upon the face of the mortgage, those errors are legally insufficient to defeat claims of that purchaser. *Colburn v. Mid–State Homes, Inc.*, 289 Ala. 255, 266 So.2d 865, 869–70 (1972). Alabama law also provides that "the protection given a holder in due course is awarded to the holder of a mortgage as well as the note which the mortgage secures." *Hardy v. Gissendaner*, 369 F.Supp. 481, 483 (M.D.Ala.1974), *aff'd*, 508 F.2d 1207 (5th Cir.1975).

We have noted on prior occasions that, in application, the federal common law defenses available to the FDIC are analogous

---

**7.** The McCulloughs make no argument that the bank was guilty of fraud in the factum—i.e., that they were fraudulently led to believe that the mortgage they were signing was not a legal document—and that a notary, had she been present, would have prevented such a fraud from occurring. Although it is possible that a claim of fraud in the factum would survive FSLIC's invocation of the *D'Oench* doctrine, *see Langley*, 484 U.S. at 93–94, 108 S.Ct. at 402, we need not decide this issue.

**8.** Were it the case that the acknowledgement flaw in the mortgage resulted in the mortgage being void, then we recognize that a serious argument could be made that federal common law would provide no respite for FSLIC. In such an instance, the instrument possessed by FSLIC would be wholly without legal consequence, "thus leaving no 'right, title or interest' that could be 'diminished or defeated.'" *Langley*, 108 S.Ct. at 402; *see FDIC v. Bracero & Rivera, Inc.*, 895 F.2d 824 (1st Cir.1990); *cf. Olney Savings & Loan Ass'n*, 885 F.2d at 275; *Grubb*, 868 F.2d at 1159.

to the defenses that could be raised by a holder in due course under state law. *See FDIC v. Gulf Life Ins. Co.*, 737 F.2d 1513, 1517–18 (11th Cir.1984); *Gunter*, 674 F.2d at 872. In both *Gulf Life* and *Gunter*, borrowers contended that the FDIC's invocation of federal common law to defeat such borrower state law defenses as estoppel, waiver, unjust enrichment, fraud in the inducement, and failure of consideration would upset settled expectations under state law. In rejecting these arguments, we observed that according the FDIC protection from these claims granted the FDIC no greater protections than those offered to a holder in due course under state law. Recognizing that a transfer of an obligation to a holder in due course was a much more likely occurrence than the assumption of the obligation by the FDIC, we concluded that "little dashing of commercial expectations would result from a uniform federal rule protecting the FDIC from such defenses."[9] *Gulf Life Ins. Corp.*, 737 F.2d at 1518.

Drawing upon this analogy, several circuits have concluded that the FDIC and the FSLIC, regardless of whether operating in a corporate or receiver capacity, are clothed under federal common law with the same defenses that would be accorded a holder in due course under state law. *See, e.g., Campbell Leasing, Inc. v. FDIC*, 901 F.2d 1244 (5th Cir.1990); *Firstsouth, F.A. v. Aqua Constr., Inc.*, 858 F.2d 441, 443 (8th Cir.1988); *FSLIC v. Murray*, 853 F.2d 1251, 1256–57 (5th Cir.1988); *FDIC v. Wood*, 758 F.2d 156, 159 (6th Cir.), *cert. denied*, 474 U.S. 944, 106 S.Ct. 308, 88

L.Ed.2d 286 (1985). As the Fifth Circuit explained in *Murray*:

> [P]roviding FSLIC with at least the status of a holder in due course promotes the necessary uniformity of law in this area while it counters individual state laws that would frustrate a basic FSLIC objective: promoting confidence and stability in financial institutions. *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728–29, 99 S.Ct. 1448, 1458–59 [59 L.Ed.2d 711] (1979); *Gunter*, 674 F.2d at 868–69. Moreover, clothing FSLIC with at least holder in due course status does not trample commercial expectations of note makers such as appellants. *See. Kimbell Foods*, 400 U.S. at 729, 99 S.Ct. at 1459. A maker must anticipate that his note may be transferred to a holder in due course; the maker therefore suffers no prejudice if the FSLIC is granted those rights. *See Wood*, 758 F.2d at 161; *Gunter*, 674 F.2d at 872.
>
> \* \* \* \* \* \*
>
> Finally, a uniform rule such as this serves the goals of predictability and rationality more effectively than the alternative of invalidating individual defenses as they arise. Establishing at least holder in due course status for FSLIC allows it, the public and the courts to draw on a well-developed body of commercial law when determining which state law defenses are clearly unenforceable against FSLIC.

853 F.2d at 1256–57.

Were we to accord FSLIC with holder in due course status in this case,[10] it is readily

---

**9.** In both *Gulf Life* and *Gunter*, we analyzed the appropriateness of according the FDIC with federal common law defenses by examining the three factors identified in *United States v. Kimbell Foods*, 440 U.S. 715, 99 S.Ct. 1448 (1979): "whether the federal program was one which by its nature required nationwide uniformity, whether adopting the state law would frustrate the specific objectives of the federal program, and whether applying a federal rule would disrupt commercial relations predicated on state law." *Gunter*, 674 F.2d at 868. Addressing whether the FDIC should be able to assert federal common law defenses emanating from *D'Oench*, we observed that the first two of the *Kimbell Foods'* factors strongly favored the ap-

plication of a uniform federal rule protecting the FDIC. *See Gulf Life*, 737 F.2d at 1517–18; *Gunter*, 674 F.2d at 869–72. Those conclusions are equally *a propos* here. While consideration of the third factor frequently leads to a much more equivocal response as to the appropriateness of constructing a federal common law defense, *see Gulf Life*, 737 F.2d at 1518; *Gunter*, 674 F.2d at 872, we conclude that, for the reasons set forth in the text, any disruption to commercial expectations is at best minimal in this case.

**10.** Because the note and mortgage were acquired through a bulk transfer, the FSLIC could not be considered a holder in due course under

apparent that the McCulloughs' claim concerning the improper acknowledgment would fail under Alabama law. For one thing, as a holder in due course, the FSLIC could not be said to have had notice of the irregularity of which the McCulloughs now complain. *See* 1975 Ala.Code § 7-3-304(4)(d). More significantly, the McCulloughs' claim concerning an irregularity in the mortgage is not cognizable against a holder in due course. *See, e.g., Colburn,* 266 So.2d at 869 ("the holder in due course of a negotiable note secured by a mortgage takes the mortgage subject to only those defenses which could be raised by the mortgagor *against the note itself*") (emphasis added). Hence, application of the FSLIC's common law defenses cannot be said to be so disruptive of settled expectations of how Alabama law would affect the commercial transaction at issue such that reliance upon federal common law should be questioned.

## VII. CONCLUSION

For all of the reasons discussed above, the judgment of the district court is affirmed.

AFFIRMED.

state law. *See* 1975 Ala.Code § 7-3-302. This fact, however, is inconsequential to the determination that the FSLIC should be treated as a holder in due course under *federal common law. Campbell Leasing,* 901 F.2d at 1249. If the FSLIC could satisfy state law holder in due course requirements, there would be no reason to invoke federal common law as state law would be sufficient. Rather, the federal common law doctrine granting the FSLIC or the FDIC holder in due course status is designed to afford the FSLIC and the FDIC the same protec-

tions to which they would be entitled had they satisfied those state law requirements. Of course, holder in due course status does not automatically and irrevocably attach to the FSLIC and the FDIC by the agencies' very nature. For example, if the FSLIC had been actively involved in creating the irregularity appearing in the mortgage, this actual participation in the creation of the flaw would preclude the FSLIC from claiming holder in due course status.